FILED
COURT OF APPEALS
DIVISION II

2013 MAY 21 AM 10: 10

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br>                              Respondent,<br><br>          v.<br><br>DESHONE VERELL HERBIN,<br>                              Appellant. | No. 41944-1-II<br><br>UNPUBLISHED OPINION |

VAN DEREN, J. — A jury returned verdicts finding Deshone Verell Herbin guilty of one count of first degree burglary, three counts of first degree kidnapping, and four counts of first degree robbery. The jury also returned special verdicts finding that Herbin committed his offenses "while armed with a deadly weapon—firearm." Herbin appeals his convictions and sentence, asserting that (1) the trial court erred by failing to instruct the jury that it did not need to be unanimous to answer "no" on the special verdict sentencing enhancement forms, (2) the trial court improperly imposed firearm sentencing enhancements due to erroneous jury instructions, and (3) his defense counsel was ineffective for failing to object to certain hearsay testimony. In his statement of additional grounds for review (SAG), Herbin asserts (1) the State's evidence was insufficient to support three of his first degree robbery convictions,[1] (2) the State's evidence was insufficient to support his three kidnapping convictions, (3) the trial court

---

[1] Herbin's appellate counsel filed a supplemental brief in support of this SAG argument.

acted outside its statutory authority by ordering mental health evaluation and treatment as a condition of community custody, (4) he received an unconstitutionally disproportionate sentence, (5) he was denied his Sixth Amendment right to an impartial jury, (6) the prosecutor's use of a PowerPoint demonstration during closing argument constituted misconduct, and (7) cumulative error denied his right to a fair trial. We affirm in part and reverse in part. We reverse three of Herbin's first degree robbery convictions and their attendant firearm sentencing enhancements for insufficient evidence; and we reverse his convictions on the remaining charges and remand for a new trial because the prosecutor committed prejudicial misconduct during closing argument.

## FACTS

Nicholas Oatfield, Zachary Dodge, Aaron Ormrod, and Nicholas Ormrod were members of a paintball team who shared a house in Olympia, Washington. All four were at home on December 27, 2009, with Dodge's fiancée, Brittany Burgess, and fellow teammate, Casey Jones. The team gathered at the Olympia house because they had scheduled an early practice the next morning. Another teammate, Malcolm Moore, came to the house around 3:30 am. When Moore arrived, Jones was asleep on a couch in the living room and everyone else was asleep in their bedrooms. Moore locked the door, made himself a sandwich, and called his girlfriend. Shortly after calling his girlfriend, Moore heard a loud knock at the door.

Moore woke up Jones and told him that something "sketchy[ ]" was going on outside the house. Report of Proceedings (RP) (Feb. 23, 2011) at 134. When Jones opened the door slightly, someone on the porch tried to force the door open. Moore and Jones attempted to shut the door and Jones began shouting for the other occupants to wake up and call 911. Moore and Jones could not shut the door, however, because someone on the porch stuck the barrel of a

2

shotgun in the door jam and yelled, "Shoot that motherfucker." RP at 150. Three men entered the home, and one of the intruders forced Moore and Jones to crawl into the kitchen/dining room area at gunpoint while the two remaining intruders made their way toward the bedrooms.[2]

Nicholas[3] woke up when he heard a commotion in the house and someone shouting to call 911. He called 911 and locked his door. Soon thereafter, a man carrying a shotgun kicked open Nicholas's bedroom door and forced Nicholas to crawl into the kitchen.

When Oatfield heard someone knocking at the door, he woke up and left his bedroom to see who was there. After hearing a loud crash and Jones shouting to call 911, Oatfield ran into Aaron's bedroom and told him that they were being robbed. Aaron woke up and called 911, while Oatfield sat against the bedroom door. Oatfield could hear footsteps in the hallway and people forcing their way into the other bedrooms. One of the intruders kicked open the bedroom door that Oatfield had been leaning against and pointed a shotgun at Oatfield's head. Oatfield quickly glanced at the intruder and, although the intruder was wearing something to obscure his face, Oatfield was able to later identify him as Herbin. Herbin then forced Oatfield and Aaron to crawl into the kitchen/dining room.

Dodge also woke up when he heard a commotion coming from the living room. Dodge peered out his bedroom door and heard intruders yelling and Jones shouting for someone to call 911. Dodge ran back into his bedroom and held Burgess until two intruders forced their way into the bedroom. The first intruder, whom Dodge later identified as Herbin, pointed a shotgun at Dodge and told the couple not to call the police or he would shoot them. Herbin then left the

---

[2] The record is unclear if the kitchen and dining room are together but the record suggests that all the victims were eventually on the dining room floor.

[3] Because Nicholas and Aaron Ormrod are twin brothers that share the same last name, we use their first names for clarity.

room and, a short time later, a second intruder armed with a shotgun entered. The second intruder took a laptop computer and some money and then forced Dodge and Burgess to walk into the kitchen/dining room and lie face down next to the others.

After the occupants and guests were forced into the kitchen/dining room, the intruders took items from Oatfield's bedroom as well as from both of the Ormrod brothers' bedrooms, which items included cash, a television, and paintball equipment. The three intruders were in the house for approximately five minutes before police arrived.

Thurston County Deputy Sheriff Rod Ditrich was the first officer to arrive at the house. As he approached, Ditrich saw a red Ford Explorer in the road with one person in the Explorer's driver's seat and another person standing just outside the passenger side of the vehicle. As Ditrich turned on his lights and drove toward the Explorer, the men fled in different directions. A short time later, Jessup Tillman, the man who had been standing outside the passenger side of the Explorer, called the police and told them that he was one of the intruders. A canine patrol officer and his dog located John Burns nearby and arrested him.

Officers found items that had been taken from the house in the Explorer. Officers also found a loaded shotgun that belonged to Tillman in the bushes near the house's front door. Police located Herbin and arrested him the following day. The State charged Herbin with first degree burglary while armed with a deadly weapon—firearm, three counts of first degree kidnapping while armed with a deadly weapon—firearm, and four counts of first degree robbery while armed with a deadly weapon—firearm.

Burns, Tillmon, and Herbin were tried together in April 2010. The jury returned verdicts finding Burns and Tillmon guilty of all charges and sentencing aggravators. But the jury could

not reach a unanimous decision about Herbin's guilt on any charges and the trial court declared a mistrial.

Herbin was tried a second time in November 2010. At Herbin's second trial, the trial court excused a juror after finding that the juror presented extrinsic evidence during deliberations. The trial court later declared a mistrial after a reconstituted jury could not reach a verdict. Herbin's third trial began on February 22, 2011.

At Herbin's third trial, Tiffani Strickland testified that she owned the Ford Explorer police had located at the crime scene and that she was acquainted with Herbin. She stated that Herbin and Herbin's father were at her home on the evening of December 26, 2009, from approximately 7:00 to 8:00 PM until around midnight. Herbin returned to Strickland's home at around 3:00 AM, woke her up, and asked for her car keys. About one hour later, police called Strickland to inquire whether her car had been stolen. Strickland told police that she had loaned the car to Herbin. When she went outside, Strickland saw a white Chevrolet Impala that she had not seen before parked in the same spot where she had parked her Explorer the previous evening. The Chevrolet Impala was registered to Tillmon, whom Strickland had never met.

Laurie Owen testified that she owned a house in Tumwater, Washington, where she lived with Herbin; Herbin's girlfriend, Ashley Perreira; and Perreira's daughter. Owen stated that Herbin and his father came to her house at around 10:00 PM on December 26, 2009. Owen woke up at around 3:00 AM when she heard Herbin talking loudly on his telephone saying, "'Come get me then. Come get me right now.'" RP (Feb. 23, 2011) at 277. Owen told Herbin to be quiet, returned to bed, and then heard someone leave the house. About one hour later, Owen received a call from Herbin's cell phone but when she answered it, there was no response.

The jury returned guilty verdicts on all charges and answered "yes" on each special verdict form. Clerks Papers (CP) at 50-65. The trial court imposed an exceptional sentence downward of 629 months. Herbin timely appeals his convictions and sentence. We address only those issues necessary to this appeal based on our reversal of his convictions for three first degree robbery convictions for insufficient evidence and our reversal and remand of his convictions for first degree burglary, three counts of first degree kidnapping, and one count of first degree robbery based in prosecutorial misconduct during closing.

ANALYSIS

I.     SUFFICIENCY OF THE EVIDENCE

In his SAG, Herbin first argues that the State's evidence was insufficient to support three of his four first degree robbery convictions. Specifically, Herbin argues that under the trial court's jury instructions, the State's evidence was insufficient to support a finding that he or an accomplice unlawfully took personal property *from the person* of Oatfield, Aaron, or Nicholas. We agree, vacate those convictions and their attendant firearm sentence enhancements, and remand for resentencing consistent with this opinion.

A. Standard of Review

Sufficient evidence exists to support a conviction if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the State. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A defendant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on

issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

We review jury instructions de novo, "within the context of the jury instructions as a whole." *State v. Jackman*, 156 Wn.2d 736, 743, 132 P.3d 136 (2006). Jury instructions, "taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). When a defendant challenges the sufficiency of the evidence in light of an incomplete or incorrect jury instruction, we determine whether sufficient evidence exists to sustain the conviction based on the given instruction. *See, e.g., Tonkovich v. Dep't of Labor & Indus.*, 31 Wn.2d 220, 225, 195 P.2d 638 (1948) ("It is the approved rule in this state that the parties are bound by the law laid down by the court in its instructions[.] . . . In such case, the sufficiency of the evidence to sustain the verdict is to be determined by the application of the instructions and rules of law laid down in the charge.").

B. Sufficiency of the Evidence—First Degree Robbery of Oatfield, Aaron, or Nicholas

Here, the trial court's jury instructions were victim-specific "to-convict" first degree robbery jury instructions, to which neither party objected at trial:

> To convict the defendant . . . of the crime of robbery in the first degree, . . . each of the following six elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about December 27, 2009, the defendant or an accomplice unlawfully took personal property *from the person of another*, [victim's name];
> (2) That the defendant or an accomplice intended to commit theft of the property;
> (3) That the taking was against the person's will by the defendant's or accomplice's use or threatened use of immediate force, violence, or fear of injury to that person or to that person's property or to the person or property of another;
> (4) That force or fear was used by the defendant or an accomplice to obtain or retain possession of the property;

(5)(a) That in the commission of these acts or in immediate flight therefrom the defendant or an accomplice was armed with a deadly weapon; or

(b) That in the commission of these acts or in the immediate flight therefrom the defendant or an accomplice displayed what appeared to be a firearm or other deadly weapon; and

(6) That any of these acts occurred in the State of Washington.

CP at 41-43 (emphasis added).

Although this instruction was based on 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 37.02, at 667 (3d ed.2008) (WPIC), the trial court's "to-convict" instructions omitted the WPIC's optional language, "[or in the presence] of another." And because the trial court's "to-convict" instructions were provided without objection, they became the law of the case. *See State v. Hames*, 74 Wn.2d 721, 725, 446 P.2d 344 (1968) (Under the "'law of the case'" doctrine, jury instructions not objected to become the law of the case. (quoting *State v. Leohner*, 69 Wn.2d 131, 134, 417 P.2d 368 (1966))).

Accordingly, to sustain a first degree robbery conviction, the State's evidence must have been sufficient to support the jury finding that Herbin or an accomplice "unlawfully took personal property *from the person of another*." CP 41-43 (emphasis added). But here the State did not present any evidence that Herbin or an accomplice took personal property *from the person* of Oatfield or from either of the Ormrod brothers. Instead, the evidence showed that Oatfield, Aaron, and Nicholas did not discover that any of their personal property had been taken until after Herbin, Tillmon, and Bruns left the home.

The State conceded this that Herbin or an accomplice did not take property from the person of Oatfield or the Ormrod brothers, when it presented its theory of the case during closing arguments:

The four victims of robbery, ladies and gentlemen, the people who in the case of Zachary Dodge, who was present when his property was stolen, or

> Nicholas Oatfield, Nicholas Ormrod and Aaron Ormrod, who were removed from their rooms so that their property could be stolen, are the victims of the robbery.

RP (Feb. 24, 2011) at 427. Because the law of the case doctrine required the State to prove that Herbin or an accomplice unlawfully took personal property *from the person* of Oatfield, Aaron, and Nicholas to sustain the first degree robbery convictions related to those victims, and because the State's evidence was insufficient to prove that requisite element of the offenses, we vacate Herbin's first degree robbery convictions in relation to those victims, as well as the attendant firearm sentence enhancements, and remand for resentencing consistent with this opinion.

C. Sufficiency of the Evidence—Kidnapping

Herbin also contends that sufficient evidence does not support his kidnapping convictions, arguing that the kidnappings were merely incidental to the first degree robbery convictions and therefore must be dismissed under our decision in *State v. Korum*, 120 Wn. App. 686, 86 P.3d 166 (2004), *aff'd in part and rev'd in part on other grounds*, 157 Wn.2d 614, 620, 141 P.3d 13 (2006). We disagree.

Although we held in *Korum* that under certain circumstances, kidnapping is merely incidental to robbery, a kidnapping is not incidental to a robbery when the victim of the kidnapping was different from the victim of the robbery. Our analysis in *Korum* relied on *State v. Green*, 94 Wn.2d 216, 226-27, 616 P.2d 628 (1980), in which our Supreme Court held that the restraint and movement of a victim that are merely incidental and integral to the commission of another crime do not constitute the independent, separate crime of kidnapping.

In *State v. Vladovic*, 99 Wn.2d 413, 424, 662 P.2d 853 (1983), the defendant, citing *Green*, argued that there was insufficient evidence that he committed kidnapping because "the acts did not bear the indicia of a true kidnapping." Our Supreme Court disagreed, concluding

that "*Green* is inapposite in the instant case since . . . the restraint of the four employees was a separate act from the robbery of Mr. Jensen. Therefore the robbery of Mr. Jensen could not supply the restraint element of the kidnappings." *Vladovic*, 99 Wn.2d at 424.

Here, the State charged Herbin with three counts of first degree kidnapping for his conduct related to Moore, Jones, and Burgess; whereas, it charged Herbin with four counts of first degree robbery for his conduct related to Dodge, Oatfield, Aaron, and Nicholas. The trial court's "to-convict" jury instructions also named each victim related to each first degree kidnapping and each first degree robbery charge. Accordingly, because each of the kidnapping victims was distinct from each of the robbery victims, we hold that Herbin's first degree kidnapping convictions are not merely incidental to his remaining first degree robbery conviction and, thus, sufficient evidence supports his kidnapping convictions.

II. PROSECUTORIAL MISCONDUCT

Herbin also argues that the prosecutor committed misconduct during closing argument by presenting a PowerPoint slide that contained the word "GUILTY" superimposed across his photograph. We agree that the prosecutor's use of certain slides during closing argument was improper and hold that the prosecutor's improper conduct resulted in such prejudice that Herbin is entitled to a new trial.

A defendant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Prejudice exists when there is a substantial likelihood that the misconduct affected the verdict. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). Because Herbin did not object to the prosecutor's allegedly improper conduct at trial, we must ascertain whether the prosecutor's misconduct was "so flagrant and ill-intentioned" that it caused an "enduring and resulting

10

prejudice" incurable by a jury instruction. *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). Under this heightened standard of review, Herbin has the burden to show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In analyzing a prosecutorial misconduct claim, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762. "'The criterion always is, has such a feeling of prejudice been engendered or located in the minds of the jury as to prevent a [defendant] from having a fair trial?'" *Emery*, 172 Wn.2d at 762 (alteration in original) (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

Here, 3 of the 119 slides contained in the record are problematic.[4] The first slide contains the words "STATE OF WASHINGTON vs." in a large font written above what appears to be Herbin's booking photograph with his name written below the photograph. Suppl. CP at 162. On that same slide, below Herbin's name, the words "GUILTY AS CHARGED" are written within quotation marks. Suppl. CP at 162. A second slide has a larger version of the same booking photograph with the following text written across the photograph:

---

[4] The State did not provide the slides used in its PowerPoint demonstration during closing arguments before Herbin's appellate counsel filed its opening brief and before Herbin filed his SAG. On August 9, 2012, this court ordered the State to provide the PowerPoint slides to appellate counsel. Although the State provided a supplemental record containing 119 PowerPoint slides, it is unclear which of the slides were actually used during closing argument. The State filed a declaration that to the best of its knowledge the 119 PowerPoint slides contained in the supplemental record represented all of the PowerPoint slides that were shown to the jury during the trial. We will assume for the sake of Herbin's argument that all of the slides contained in the record were shown to the jury during closing argument.

(FACE) ". . . burned in my memory . . .
. . . scariest day of my life . . ."
Nick Oatfield

Suppl. CP at 249. Finally, the third slide also contains Herbin's booking photograph

with the word "GUILTY" written across his face in a large font. Suppl. CP at 259. In this same

slide, Herbin's photograph and the word "GUILTY" are circled and several arrows are pointing

at the encircled photograph with various text written at the start of each arrow describing various

pieces of evidence such as, "Identified by Nick Oatfield," and "Ford Explorer at crime scene."

Suppl. CP at 259.

The prosecutor's use of these slides during closing argument was improper. Our

Supreme Court has recently analyzed a prosecutorial misconduct claim related to the

prosecutor's use of PowerPoint slides during closing argument in *State v. Glasmann*, 175 Wn.2d

696, 286 P.3d 673 (2012). In *Glasmann*, the prosecutor presented at least five slides that

contained the defendant's booking photograph, in which he had a bloody and unkempt

appearance due to his altercation with police during his arrest, and each of the slides contained a

caption. 175 Wn.2d at 701-702, 706. Our Supreme Court described these slides as follows:

> In one slide, the booking photo appeared above the caption, "DO YOU BELIEVE
> HIM?" In another booking photo slide the caption read, "WHY SHOULD YOU
> BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" Near the end of
> the presentation, the booking photo appeared three more times: first with the word
> "GUILTY" superimposed diagonally in red letters across Glasmann's battered
> face. In the second slide the word "GUILTY" was superimposed in red letters
> again in the opposite direction, forming an "X" shape across Glasmann's face. In
> the third slide, the word "GUILTY," again in red letters, was superimposed
> horizontally over the previously superimposed words.

*Glasmann*, 175 Wn.2d at 701-702 (internal record citations omitted). In addition to the slides

described above, the prosecutor presented the following slides during closing arguments:

12

One slide showed Glasmann crouched behind the minimart counter with a choke hold on [the victim] and a caption reading, "YOU JUST BROKE OUR LOVE." Another slide featuring a photograph of [the victim's] back injuries appeared with the captions, "What was happening right before defendant drove over [the victim] . . ." and ". . . you were beating the crap out of me!" This slide also featured accompanying audio.

*Glasmann*, 175 Wn.2d at 701 (alterations in original) (internal record citations omitted).

The court held that the prosecutor's use of these slides was improper, reasoning that the slides expressed the prosecutor's personal opinion of the defendant's guilt and presented evidence that was not part of the trial. *Glasmann*, 175 Wn.2d at 706-707. It noted that "there w[as] no sequence of photographs in evidence with 'GUILTY' on the face or 'GUILTY, GUILTY, GUILTY.' Yet this 'evidence' was made a part of the trial by the prosecutor during closing argument." *Glasmann*, 175 Wn.2d at 706 (internal record citations omitted).

Similarly here, there was no evidence at trial depicting Herbin's face with the word "GUILTY" superimposed on it and it was improper for the prosecutor to present this slide at closing. Additionally, the use of the slide containing the text, "GUILTY AS CHARGED" in quotation marks suggests the prosecutor's personal belief as to Herbin's guilt, particularly because this quoted phrase was not attributable to any trial testimony. Suppl. CP at 162. Finally, the use of Oatfield's testimony, "(FACE) 'burned in my memory . . . . . . scariest day of my life . . .'" superimposed over an enlarged photograph of Herbin could potentially inflame the passions of the jury by suggesting that Herbin is a scary and dangerous person. Suppl. CP at 249. Accordingly, the prosecutor's use of these slides was improper.

Moreover, we agree with Herbin that the prosecutor's improper use of these slides requires reversal of his convictions. We recognize that this case is distinguishable from *Glasmann* because, unlike Glasmann, Herbin's booking photograph does not depict him in a

bloody an unkempt manner, "a condition likely to have resulted in even greater impact because of captions that challenged the jury to question the truthfulness of [Glasmann's] testimony." *Glasmann*, 175 Wn.2d at 705. Also unlike Glasmann, Herbin's credibility was not directly at issue since he did not testify at trial, and none of the prosecutor's slides commented on Herbin's credibility. Despite these distinctions, however, we hold that the use of the slides resulted in prejudice that "had a substantial likelihood of affecting the jury verdict" warranting a new trial. *Thorgerson*, 172 Wn.2d at 455.

Like *Glasmann*, here the prosecutor "intentionally presented the jury with copies of [Herbin's] booking photograph altered by the addition of phrases calculated to influence the jury's assessment of [Herbin's] guilt." 175 Wn.2d at 705. As our Supreme Court reasoned when holding that the prosecutor's use of a similarly altered booking photograph was misconduct warranting a new trial, "the prosecutor's modification of photographs by adding captions was the equivalent of unadmitted evidence . . . made a part of the trial by the prosecutor during closing argument." *Glasmann*, 175 Wn.2d at 706. Additionally, although we recognize that the prosecutor here linked the "GUILTY" statement superimposed over Herbin's booking photograph with various pieces of evidence presented during the trial and, thus, did not express a personal opinion of Herbin's guilt through use of that slide, the prosecutor did express a personal opinion of Herbin's guilt when presenting a slide with the phrase "GUILTY AS CHARGED" written beneath Herbin's booking photograph.[5] Suppl. CP at 259, 162.

Following *Glasmann*, we hold that the prosecutor's use of slides containing Herbin's altered booking photograph "was so pervasive that it could not have been cured by an

---

[5] The record on appeal does not indicate the nature of the prosecutor's argument when presenting this slide to the jury.

14

instruction." 175 Wn.2d at 707. As our Supreme Court recognized when reversing Glasmann's convictions for prosecutorial misconduct, "Highly prejudicial images may sway a jury in ways that words cannot" and, thus, "may be very difficult to overcome with an instruction." *Glasmann*, 175 Wn.2d at 707 (citing *State v. Gregory*, 158 Wn.2d 759, 866-67, 147 P.3d 1201 (2006)). Because the prosecutor's misconduct in presenting highly inflammatory slides containing Herbin's altered booking photograph had a substantial likelihood of affecting the jury verdict that was incurable by a jury instruction, we reverse Herbin's remaining convictions and remand for a new trial.

We reverse three of Herbin's first degree robbery convictions and their attendant firearm sentence enhancements for lack of sufficient evidence, reverse and remand Herbin's convictions for one count of first degree burglary, three counts of first degree kidnapping, and one count of

No. 41944-1-II

first degree robbery for a new trial based on prosecutorial misconduct in closing.[6]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

VAN DEREN, J.

We concur:

PENOYAR, J.

WORSWICK, C.J.

---

[6] We decline to address several of Herbin's asserted issues on appeal in light of our reversal of his three first degree robbery convictions for insufficient evidence and our reversal of his remaining convictions based in prosecutorial misconduct during closing. But we note that, to the extent that Herbin argues that his counsel's failure to object to hearsay testimony prejudiced him because sufficient evidence did not support the imposition of firearm enhancements absent the hearsay testimony, his argument fails. Here, even assuming that Detective Hamilton's testimony regarding the operability of the firearm found at the Olympia home was objectionable hearsay, eyewitness testimony describing the shotguns possessed by Herbin, Tillmon, and Burns during the course of the home invasion was sufficient to support the jury's finding that Herbin was armed with a firearm during the commission of his offenses. *See e.g.*, *State v. Mathe*, 35 Wn. App. 572, 581-82, 668 P.2d 599 (1983) (State presented sufficient evidence that defendant "used a real and operable gun" with the testimony of two eyewitnesses who described in detail the guns used by the defendant), *aff'd*, 102 Wn.2d 537, 688 P.2d 859 (1984); *State v. Bowman*, 36 Wn. App. 798, 803, 678 P.2d 1273 (1984) ("'The evidence is sufficient if a witness to the crime has testified to the presence of such a weapon, as happened here. . . . The evidence may be circumstantial; no weapon need be produced or introduced.'" (quoting *Tongate*, 93 Wn.2d 751, 754, 613 P.2d 121 (1980))).

16